Good morning, Raul Severo here on behalf of the appellant Jose Renderos. It's a preliminary matter. We would like to concede the first point raised in our briefs concerning the Osuna Alvarez, which came down after the filing of our brief. The principal issue that we'd like to address with this court this morning, and that is before the court, is whether standing alone the use of an alias or a fictitious name to rent a storage facility is sufficient to defeat the protections of the Fourth Amendment against unreasonable searches and seizures. The undisputed evidence before the district court was that the defendant in this case had paid the rent for the unit in cash, he had stored his personal belongings in the unit, he kept the unit locked, and he had a key to the unit. The unit was surrounded by iron gates controlled by special access codes. At least since 1988 when this court decided U.S. v. Johns, the courts have recognized a legitimate expectation of privacy in storage units, even when a defendant's name did not appear on the rental agreement for such a unit. And the rule in this circuit has also long been that if the occupant of a hotel room has procured that room by fraud, the occupant's Fourth Amendment expectation of privacy is not extinguished until the hotel has taken positive steps to repossess the room. That was in CUNAG, which cited what's commonly known as the Doré's rule, and CUNAG also cited Bautista. It is the affirmative act of repossession, as the Doré rule requires, that obliterates any expectation of privacy. The problem with the district court's ruling here is that it essentially turns the Fourth Amendment in this regard, is that it essentially turns the Fourth Amendment on its head by requiring that the search be justified after the fact, once it has been shown that there was criminal activity afoot. The legitimate expectation of privacy, I think the cases have long held that the legitimate expectation of privacy does not depend upon the defendant's criminal activities, defendant's innocent or criminal. If this were the case, then the police could enter a private home without warrants, and if they found drugs or other contraband, they could simply justify the search by citing the rule that society is not prepared to accept as reasonable an expectation of privacy and crack cocaine kept in private homes. That's not what the rule is. What the government argues is that because an alias in the district court rule was that because an alias was used in this instance to cloak the identity of the true party for nefarious purposes, by extension anyone with a legitimate reason to remain anonymous should lose their expectation of privacy. We think that there are legitimate reasons that persons might use an alias to rent a storage unit. And I was reminded last night, I had a an uncle who was a composer, a film composer, Robert Van Epps. I was reminded last night by her relative that he used to write under a pseudonym, and he used to, he didn't want Hollywood to find that he was writing under the pseudonym, so he used to store all his materials in this type of a unit under an alias. There are probably many other examples. The inventor who wants to keep a prototype away from the prying eyes of his competitors by storing it in a unit such as this under an alias. A battered spouse who wants to keep her property from her abusive spouse by storing it under an alias in a storage unit like this. Mr. Severo, assuming we agree with you that the trial court was incorrect in ruling there was no legitimate expectation of false name, do we still have to reverse? Couldn't we find that there was a legitimate search of the storage unit based on the fact that they were able to see the items through the gap from the wall to the ceiling? That is the question of whether these observations were plain view observations. It unfortunately doesn't come through the photographs that were appended to the record in Black and White Don't Do Justice to just how difficult it was to get up on a ladder and the way they had to crane their neck and to be able to see what they claimed they saw, which was even ballpoint But you argued all that to the district court, right? Yes. And the district court's in a much better position to evaluate that than we are. That's true. So how, you know, aren't we stuck with those factual findings? Yes, you are. Okay. And so basically, based on that, the only issue that really we wanted to address in this argument was the issue of stand, what's commonly known as standing. Other than that, we would submit on the briefs. Good morning, Your Honors. Wes Hsu on behalf of the United States. I think that the court has the Even if the court were to find that there was a legitimate expectation, a objective legitimate expectation of privacy in the storage unit, what the district court found, as a matter of fact, was that there was no search of the storage unit in order to see the contents of it. There was a visual observation from outside of the storage unit to see all of the items that were included in the eventual search warrant application that the magistrate judge signed that allowed the search to proceed. Seems to kind of stretch the plain view doctrine when you have to go into a private space, climb a ladder and peer over a gap in the wall. But, Your Honor, I think that the private space that the court is referring to is not the defendant's private space. It is the public storage's private space. And so the defendant has no basis to complain that the agents were standing in the hall and standing in an empty unit next door. And so because the law enforcement officers had a right to be where they were standing, because they had been given permission by public storage to do that, they were allowed to view what they what could be viewed with the naked eye and with the assistance of a flashlight in the ladder. Well, what picture supports what you just said? There was actually, there were a number of pictures and a video that was shown during the evidentiary hearing that the district court held over the better part of a day on September 16th. And in fact, the video, which I can see is not in the excerpts of record, but the video that was played and that the basically without his head intruding upon the storage unit. Without his head? Correct. Without his head. The pictures they have appear to be a woman. Yes, Your Honor. That's the defense investigator. Those are the photos prepared by the defense counsel and submitted to the district court. The government responded with a video that showed the actual case agent climbing the ladder and peering over. And the district court reviewed that video as part of the evidentiary. Do you have those pictures? I do not have the video with me. It would have to be. You don't have any still pictures? Not from that video. No, Your Honor. But I think the government's position, and certainly we could submit those to the court after the fact. They were part of the district record, but you didn't file them as part of the excerpts? Let me ask you a question. Yes, Your Honor. When the government went in to this storage building, what evidence was in the government's possession? So the defendant had already been arrested. He had been arrested five days before. He had been arrested in the van with a little bit over 12,000 counterfeit credit cards that were seized in the van. There were additional counterfeit credit cards seized in the van at the time. And when arrested, he was in possession of a valid California driver's license for him, but in the stolen identity that was also used to rent the storage unit. Those were all facts that were included in the affidavit. Well, let's say that again. He had a valid California driver's license. In the name of Eduardo Monserrat Rodriguez, I believe is the last name, the same identity that was used to rent this storage unit. That identity was used to obtain a California driver's license that was taken from his person when he was arrested. Taken from where? His person. It was in his pocket. His person? Yes. And then there were also other miscellaneous cards that could be used as part of a counterfeit credit card scheme seized from inside the van. Separately, the government also knew, although it was not included in the affidavit, because the defendant's son had cooperated with law enforcement officers at the time of the defendant's arrest and informed those law enforcement officers that this storage unit existed and that it was used as part of the scheme. Well, what brought about the defendant's arrest in the first place? So, this case was initiated when the government intercepted a shipment of about 12,000 counterfeit credit cards in four boxes coming in from China. We conducted a controlled delivery of 4,000 of those one box of those counterfeit credit cards. They were scheduled and they were delivered to the defendant's son. Well, did those counterfeit cards have people's names on them? No, they were cards. They were unembossed cards with bank artwork on the front, I guess, is the best way to put it. They were blank. They were blank cards, correct. And those were delivered to the defendant's son, the defendant's son subsequently with a tracking device installed for which a warrant was obtained. The son then delivered the box to his the defendant in a parking lot. The defendant then. This is the warrant that was what you call an anticipatory warrant? Correct. Yes, that's the subject of the van. So, after they met in a parking lot, law enforcement determined through the GPS that the box had switched vans and that it was now in the defendant's van. The defendant at some point, several minutes later, realized that he was being tracked. There's no evidence in the record as to exactly when he realized he was being tracked, but then he engaged law enforcement in a high speed chase. He drove erratically and quite fast through neighborhoods. He eventually abandoned the van in a parking lot and he was arrested a few minutes later while on foot trying to flee the van. And so all of that was known at the time that the storage locker search warrant was obtained from the magistrate judge. Well, that's when you got the warrant. Correct. I'm talking about before you got the warrant. It was the same day, your honor, that the agents never left. The agents went to the storage unit. They made the observations. They were. What I want to know is this. Did you have enough evidence so that there was some probable cause sufficient to obtain a search warrant? Before you send somebody in there with a ladder and a camera. Well, I would have two responses to that. One. Well, just give me your response. I submit that we did. Why didn't you go get the search warrant? We did get the search warrant, your honor. But you did it after. You went and peeked through the top. Yes, your honor. Because we wanted, well, we did not include in the affidavit the defendant's son's statement to us, to law enforcement. But we wanted to include evidence that could be visually seen from where they had a right to be. They did not go in. But you had evidence. You had evidence. You didn't have to put anything about the son. You had evidence that this contraband was stored in this particular warehouse. You knew that. And you knew the name under which it was stored. Yes. So why wasn't that enough to go and get a search warrant? Well, I would argue that it was. So why didn't you do it? Because we believed that since they had a lawful right to view the contents from outside of the storage unit, that they could add that information on top of the probable cause that we already had. And as the district court... Well, you thought you were going to bust the guy sooner than you did, right? I mean, something happened that the GPS wasn't, when it changed from one car to another. The... I mean, the anticipatory warrant waits for you to open it. Correct. Yes, exactly. So you don't really... Did you know exactly that it was going to come down, that there would be a switch and how the whole thing would come down going into it? No, Your Honor. No. So it was a little bit of a rolling operation. It was. On February 1st, it was a rolling operation. It just developed as it happened. So did you know going into it, you were going to end up at the storage locker? No. No, Your Honor. So is that why maybe you didn't get a search warrant for the storage locker? Because you didn't even know you were going to be there, right? No. I mean, you eventually got one, but... Well, so no. I just want to make sure... Let me tell you what my view is, all right? Yes, Your Honor. It doesn't take much to get a search warrant, does it? Does it? Well, I... Have you ever applied for one? Yes, Your Honor. It doesn't take that much to get a search warrant. Well, it takes probable cause, and... Yeah, and you don't need a lot for that. But I believe that it is in the government's interest to include in a search warrant any evidence that you can, that is lawfully obtained, in order to support the request for a search warrant. And so even... Did you know when we went into that storage unit that there was that space that you could look through? When we... I'm not sure I understand what you mean by went into. Well, had anybody been in that storage unit and checked it out before you went in there and sent somebody up with a ladder? If you're talking about inside the unit itself, then we did not enter the unit until the search warrant was obtained and executed. No, but you went inside the adjacent unit and... Yes. So I think what I'm struggling with, and I don't mean to speak for my colleague... No, no, go ahead. But perhaps what Judge Pregerson is struggling with is why did you even go to the storage unit? You didn't have a warrant, and you haven't told us why you went. Because... Okay, so the son cooperated with us on February 1st when the defendant was arrested. During that cooperation, he informed law enforcement that there was a storage unit at Portreiro Grande that the defendant used as part of the scheme. We went to that storage unit on February... He said that they used it as part of the scheme? I believe so, yes. So why didn't you go to a magistrate judge then and ask for a warrant? It's not in the record, but I'm happy to inform the court of my recollection of it, but it was not presented to the district court as part of the record. At the time, the defendant's son is quite young, and the fact that he was cooperating with law enforcement against his biological father was something that we were sensitive to, and we didn't want to expose him to more conflict with his father at that early stage in the proceeding. We didn't know at the time that he would eventually end up testifying against his father at the trial. Let's assume this court, and just assume, because we haven't discussed it, and we don't know what we're going to do collectively, but let's assume that collectively this panel had trouble with the viewing into the unit, and we decide that the district court should have granted that motion to express. Just assume that. Does that impact the ultimate conviction for Mr. Renderos? I guess in my mind, there's still evidence that he was responsible for the credit cards or the fake credit cards that you found in the van, right? Yes. I would have to look at the specific counts for which he was convicted. He was convicted on seven counts. Right. So some of them could be out of the storage locker. For sure.  I think there was a possession count that was out of the storage locker, but I think the majority of the counts would not be impacted. But there was at least one count that I'm remembering off the top of my head. All I'm really saying is this. We have to have respect for the Fourth Amendment. All right? It's in this place. And you file an affidavit. You can even do it by telephone, and you can get a search warrant without having to face the argument that you conducted an illegal search by sending somebody up on a ladder to get their head into a narrow space. Was there a camera up there when you were there? You did take... When this person went up, did that person have a camera? No pictures were taken prior to the application for the search warrant. I guess since we're going with the all I am saying is while the law would never prevent you from asking for a search warrant, the law doesn't always require you to. So maybe you want to restate why you don't think you were required under legal principles that affect the Fourth Amendment here. Yes, Your Honor. There is significant case law that visual observation by a law enforcement officer of an interior of any space, a house, an automobile, from a place where that officer is lawfully allowed to be, that is not a search for Fourth Amendment principles. That is a visual observation and only that. And therefore, what the district court found, as a matter of fact, that there was no search that was the but-for cause of discovering any evidence inside that storage locker. There was a visual observation from where the law enforcement officer was entitled to be from outside of the storage locker. Well, look, I'm not going to convince you otherwise, but I think due respect for the Fourth Amendment. You need to go, before you do those things, you go to somebody else's place and you get up on a ladder. I mean, as I look at these pictures, I don't see how the ones I have here, how you can find out what's in the next storage unit unless you somehow get your head up there and can get it, you know, get through. And that would certainly convince me that whoever had their gear in there had some reasonable expectation of privacy when they were in that storage place. And I don't see why you didn't have enough for probable cause to go to a magistrate and get a search warrant, and why that was necessary to go in there and stick somebody's head or whatever it was in that very narrow space. Your Honor, just to be clear, the district court found that there was no intrusion into the space over the storage unit. There was no crossing of that, no intentional crossing of that vertical plane, and certainly no crossing of that plane into the storage unit or the airspace above that storage unit that resulted in them observing anything that they would not have observed from the outside. And, in fact, the district court found did observe from outside of the storage unit. And the district court, you know, Judge Collins made very clear... Was all this necessary? Your Honor, there are many times where the government believes that it's prudent to add to the probable cause showing. We want to make sure that the magistrate judge has sufficient evidence beyond the probable cause standard to grant the warrant. Have you ever had a magistrate judge turn down an application for a search warrant? Yes, Your Honor, the office has, absolutely. Yeah. How often does that happen? It's not often, concededly, but again... Once a year? I don't know. I can't answer that question. I don't know the answer to that question. But I will say that the rarity of... If you get that information, would you just send it to me? I'd be curious. I'm not sure how I could collect it, but I will try and find that out. It's just like writs of habeas corpus. You can have 2,000 of them filed in L.A., and one is granted a year. That may be the case, but I think as a representative of the office, what I would suggest is that might be because we are putting in more evidence than the probable cause standard requires to make sure that we can succeed in our applications for search warrants. Well, you've heard, no good deed goes unpunished. No, no. I'm not talking about search warrants. I'm talking just about how things turned out. I understand, Your Honor. I'm far over my time, so unless the Court has further questions, I will submit them. That's all right. You can stay there all day and talk to me. Thank you. I just want to take a moment of the Court's time because that was a confounding, as I was preparing for this case, the confounding part of preparing for this case is they had arrested the defendant on February 1st. They had gotten all those 12,000 unembossed credit cards in the van. They had the testimony of the co-conspirator, the son, saying he kept the device-making equipment and the evidence in the storage unit. Why not get a search warrant? Well, what's your best case to tell us that we can tell the police how to do their job other than to follow the law? That's right. There isn't. I don't have one. But I think it's very telling that the officers in this case, the Secret Service agent testified, Aviles, testified when he was asked that at the Motion to Suppress hearing, he was asked, and you didn't, question, and you didn't try to get a search warrant based on Mr. Ulloa's statement, correct? Answer, no, we did not obtain one based on that. Question, and that is because you weren't sure what Mr. Ulloa was saying, whether what he was saying was reliable? Answer, I was pretty confident of what he was saying. I mean, we're investigators. We need to look into it. We just can't go by what somebody tells us. We're going to search it. And when you look at the pictures, the color pictures of this space, which I brought with me, it is pretty much of a stretch to say these were plain view observations. Thank you. What does the evidence show about the height of that space? I have these color pictures. Tell me what it is. Well, it shows that there is a 14-inch gap between the ceiling and the top of the wall. The problem is that there are these horizontal joists that are 13 inches long, and they're 24 inches apart this way. So in order to be able to peer into that space, you have to actually wedge your head between that joist and the wall. So you've got two by fours horizontally? Yes. It's like a frame, is it? Yes, it's part of the framing. It's a joist. You've got a horizontal two by fours. You've got another one up here. You have a vertical joist that these vertical joists are 24 inches apart. And so in order to get to see over the wall, you have to crane your neck under one of those joists in order to do that. And we don't think that there was any way you couldn't do it without intruding into the space. The district judge said it was likely that there was a momentary, accidental, unintentional intrusion into the space by the agents in the process of conducting these plain view observations. Thank you. Thank you. Okay, thanks.
judges: Bastian, Pregerson, Callahan